STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

KEVIN O'CONNOR, ET UX

VERSUS

THE GROVE HOMEOWNERS ASSOCIATION, ET AL.

**********

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. 2018-5446, DIVISON "D"
HONORABLE EDWARD D. RUBIN, DISTRICT JUDGE

**********

JONATHAN W. PERRY
JUDGE

**********

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Van H. Kyzar, and Jonathan W. Perry, Judges.

REVERSED AND RENDERED.

John A. Mouton, III
Post Office Box 82438
Lafayette, Louisiana  70598-2438
(337) 988-6499
COUNSEL FOR PLAINTIFFS/APPELLANTS:
    Kevin and Blair O'Connor


Thomas R. Hightower, Jr.
Wade Kee
Thomas R. Hightower, III
Charles T. Texada, Jr.
Law Offices of Thomas R. Hightower, Jr., APLC
Post Office Drawer 51288
Lafayette, Louisiana  70505
(337) 233-0555
COUNSEL FOR PLAINTIFFS/APPELLANTS:
    Kevin and Blair O'Connor

Jack E. Truitt
Lou Anne Milliman
Michelle Mayne Davis
Nancy N. Butcher
Lauren A. Duncan
Jonathan M. Lee
The Truitt Law Firm, LLC
149 North New Hampshire Street
Covington, Louisiana  70433
(985) 327-5266
COUNSEL FOR DEFENDANTS/APPELLEES:
   The Hidden Grove Homeowners Association, Inc. and
   Hidden Grove, LLC


Doris T. Bobadilla
Megan M. Clark
Galloway, Johnson, Tompkins, Burr & Smith, APLC
328 Settlers Trace Boulevard
Lafayette, Louisiana  70508
(337) 735-1760
COUNSEL FOR DEFENDANTS/APPELLEES:
   Thomas F. Desormeaux, Kendra Desormeaux, Karen Lee Hail,
   Cesar Augusto Ramirez-Astacio, Brittany Deshotel Ramirez,
   Stephen Deval Gremillion, Linda Lou Hill Gremillion, Thomas
   Kirby Arceneaux, Ross Kenneth LeBlanc, Erin Elizabeth Zuschlag
   LeBlanc, James A. Chance, Terence R. Chapman, Andrea Bertinot
   Chapman, Mark Blaine Chaisson, Tiffany Zerangue Chaisson,
   Margaret "Pegge" Luken Alciatore, Douglas Terrence Ryan, Erin
   Kennedy Ryan, Richard Andrew Brauns, Leslie Donner Brauns,
   J.W. Digiglia, and Lea Raye Digiglia


Travis J. Broussard
Durio, McGoffin, Stagg
Post Office Box 51308
Lafayette, Louisiana  70505-1308
(337) 233-0300
COUNSEL FOR DEFENDANT/APPELLEE:
   Thomas Kirby Arceneaux

**PERRY, Judge.**

Plaintiffs appeal the issuance of a permanent injunction against them in favor of Defendants. For the following reasons, the judgment of the trial court is reversed. We render judgment (1) issuing a preliminary injunction in favor of Plaintiffs against Defendants and (2) denying Defendants' petitions for injunctive relief.

### FACTS AND PROCEDURAL HISTORY

Plaintiffs, Kevin and Blair O'Connor ("Plaintiffs"), are the owners of property located at 805 Cambridge Drive in Lafayette, Louisiana, having purchased the property from Kevin O'Connor's parents in 2010. Plaintiffs' property, situated near the Vermilion River, is bordered by a coulee on its northern and eastern sides. Across the coulee from Plaintiffs' property lies the Hidden Grove Subdivision ("The Grove"). Access to The Grove is facilitated by a bridge which spans the coulee, the center of which serves as the boundary between Plaintiffs' property and The Grove. Access to the bridge is afforded by a predial servitude[1] which extends from Cambridge Drive to the property line of The Grove. A private road named Hidden Grove Place signifies the right of way between Cambridge Drive, a public street, and

---

[1] The Act of Credit Sale between Plaintiffs' ancestors in title which established the predial servitude on November 15, 1976, provides in pertinent part:

> Vendor does expressly grant and dedicate unto purchasers, their heirs, successors, and/or assigns, a fifty foot (50') road right-of-way, easement and/or servitude over vendor's remaining property to purchasers' above described and foregoing property, which road right-of-way will commence from purchasers' property and run in a northwesterly direction over a concrete bridge (measuring approximately 36' x 12'), thence in a westerly direction a distance of approximately 122 feet (which 122 feet shall run immediately South of, and parallel to, vendor's four foot chain linked wire fence imbedded in a narrow concrete wall) and will traverse vendor's concrete retaining wall and/or swail ditch, and shall then run in a northwesterly direction (immediately south of, and parallel to, said vendor's concrete retaining wall and/or swail ditch) to a point where said road right-of-way shall intersect and join University Row.

> That certain 36 foot by 12 foot concrete bridge (indicated on the above described plat) over the concrete coulee and/or drainage canal connecting the above described property with a fifty foot access easement, road right-of-way, and or servitude more fully described herein.

the bridge which spans the coulee.  A dispute over the scope of the servitude which encumbers Plaintiffs' property is the basis for this litigation.

On August 31, 2018, Plaintiffs filed a petition for declaratory judgment seeking a judicial determination about the extent of the predial servitude established in 1976 which encumbers their property.  Named Defendants herein are: (1) Hidden Grove, LLC, the developer of The Grove; (2) The Hidden Grove Homeowners' Association ("the HOA"), a non-profit organization established for the purpose of maintaining the common areas of The Grove; and the owners of all lots in The Grove, namely, (3) Thomas F. Desormeaux; (4) Kendra Desormeaux; (5) Karen Lee Hail; (6) Cesar Augusto Ramirez-Astacio; (7) Brittany Deshotel Ramirez; (8) Stephen Deval Gremillion; (9) Linda Lou Hill Gremillion; (10) Thomas Kirby Arceneaux; (11) Ross Kenneth LeBlanc; (12) Erin Elizabeth Zuschlag LeBlanc; (13) James A. Chance; (14) Terence R. Chapman; (15) Andrea Bertinot Chapman; (16) Mark Blaine Chaisson; (17) Tiffany Zerangue Chaisson; (18) Margaret "Pegge" Luken Alciatore; (19) Douglas Terrence Ryan; (20) Erin Kennedy Ryan; (21) Richard Andrew Brauns; (22) Leslie Donner Brauns; (23) J.W. Digiglia; and (24) Lea Raye Digiglia (henceforth the twenty-two lot owners will be collectively referred to as "the homeowner Defendants").

Plaintiffs contend the servitude grants Defendants a right of way which is limited to ingress and egress and allege Defendants' actions exceed the right granted by the servitude, violating Plaintiffs' property rights in the process.  Defendants contend Plaintiffs unlawfully restrict their use of the right of way.

The instant appeal concerns opposing requests for injunctive relief. Defendants filed petitions[2] for temporary restraining order and preliminary and

---

[2] Hidden Grove, LLC, and the HOA filed a petition and the homeowner Defendants filed a separate petition for injunctive relief, pleading corresponding allegations.

permanent injunctive relief. In said petitions, Defendants allege Plaintiffs have interfered with repairs to an electronic gate and a gas lantern, and have destroyed improvements made by Defendants, i.e., trees, all of which are located on the right of way.

The hearing on Defendants' temporary restraining order, on March 18, 2019, concluded with the trial court stating it would visit the right of way. Additionally, the trial court specified it would consider Defendants' request for a preliminary injunction on April 8, 2019.

On April 3, 2019, Plaintiffs filed their own petition for temporary restraining order and injunctive relief in which they sought to enjoin Defendants from harassing them, threatening them, and trespassing on property which lies outside the right of way in dispute. The record indicates Plaintiffs' petition for injunctive relief was also set for hearing on April 8, 2019.

The hearing on April 8, 2019, began with arguments from counsel, after which the trial court pronounced it would issue to Defendants' a permanent injunction. Counsel for Plaintiffs objected, urging that only a hearing on preliminary injunctions was noticed. The trial court allowed the parties to present evidence following a suggestion by counsel[3] for one of the homeowner Defendants.

Thereafter, Defendants called a single witness to testify. Karen Hail, who owns a home in The Grove, testified her first recollection of there being a conflict with Plaintiffs was in October 2017. Ms. Hail recalled Plaintiffs being "upset about some things that had gone on with the third-party contractor" who was installing a bulkhead. According to Ms. Hail, "that was the first time, I think, I had heard from [Mr. O'Connor] about the walls of the bridge, and that we hadn't used a licensed

---

[3] Defense counsel Travis Broussard, whom the record reflects is enrolled as counsel for one homeowner Defendant, Thomas Kirby Arceneaux, suggested, "Your Honor, we can resolve it by putting two witnesses on the stand and Your Honor can enter a permanent injunction."

contractor, and that it hadn't been approved by the City and things like that." In August 2018, a contractor who was working on Ms. Hail's home parked a lift "probably halfway on the right of way for the O'Connors and halfway on where the City property is." She recalled receiving a telephone call from her attorney indicating that Plaintiffs' attorney "want[ed] to know when [the lift was] going to be moved from the street." Also in August 2018, the day before Plaintiffs filed the instant lawsuit, Ms. Hail spoke with Mr. O'Connor about having the grass cut on the City's property near the right of way. She described, "[H]e and I just had -- probably -- I say -- not -- it was just a good conversation about doing that." Ms. Hail described an incident, which occurred on February 10, 2019, when she was with three other homeowner Defendants who were attempting to repair the motor of an electronic gate at The Grove's entrance, on the right of way. Ms. Hail testified Plaintiffs threatened to cut landscaping if homeowner Defendants did not stop working on the electronic gate. Homeowner Defendants did not stop working, and Plaintiffs cut down several crepe myrtle trees which were less than ten feet from the electronic gate. The final incident Ms. Hail described occurred two days later, on February 12, 2019, when Plaintiffs used a tractor to remove The Grove's marble sign, placing it at the corner of Cambridge Drive and Hidden Grove Place.

On cross examination, Ms. Hail testified she has read the right-of-way agreement dated 1976 and acknowledged it did not provide for landscaping, gas lines, gas lanterns, or a gate. She explained The Grove has two electronic gates, one for entrance and one for exit, and conceded that occasionally the electronic entrance-gate malfunctions, requiring the electronic exit-gate to serve as both an entry to and exit from The Grove. Ms. Hail declared she considered it harassment for Plaintiffs' attorney to call her attorney, who then called her, in reference to the lift that had been parked on the right of way by a contractor she hired in August

4

2018. Finally, Ms. Hail testified there was no harassment when she conversed with Mr. O'Connor about having the grass cut on the City's property in August 2018.

On redirect examination, Ms. Hail testified the personnel who were previously hired to repair the electronic gates no longer wanted to be hired "because of their dealings with Mr. O'Connor[.]" She also claimed, though she was not the individual responsible, that it was her understanding Plaintiffs were provided the information they requested regarding insurance for the contractor who worked on the bridge and the bulkhead.

Both Plaintiffs, Kevin and Blair O'Connor, testified concerning harassment and intimidation directed toward them by Defendants. Mr. O'Connor explained he and his wife were seeking an injunction against Defendants because their property rights were being ignored.

According to Mr. O'Connor, in fall 2017, he noticed construction work being performed on the bridge crossing the coulee, property of which Plaintiffs own half. He initially assumed the work was being performed by the Lafayette City-Parish Consolidated Government ("LCG"). After speaking to construction workers, however, Mr. O'Connor learned the workers were not LCG employees and, instead, were hired by Steve Gremillion, a homeowner Defendant. Plaintiffs had not been given notice of the work on the bridge crossing the coulee by Defendants. Mr. O'Connor deduced that unlicensed contractors were performing the work without permits. A certified letter, dated October 4, 2017, was sent from the Public Works Department of LCG notifying Steve Gremillion that, "LCG has not received the appropriate engineering analyses and construction plan for the construction activities being performed within this area. Therefore, in accordance with NFIP

5

FEMA regulations, LGC requires a Cease and Desist of both[4] construction activities until further notice."

Mr. O'Connor claimed he was informed by LCG that as an owner of a portion of the property on which the unsanctioned construction work occurred, he could be financially responsible for any necessary repairs. He stated Defendants had verbally "offered hold harmless agreements" to absolve Plaintiffs of financial liability, but no written agreement had been attained. Mr. O'Connor testified he was particularly concerned because subsequent to the construction in 2017, cracks had formed in the coulee walls on his property.

Mr. O'Connor testified the right-of-way agreement dated 1976 contains no provisions for landscaping, gas lines, or gas lanterns. He recalled the gate was erected around the time The Grove was developed, in either 2001 or 2002, recollecting, "I grew up on that property and it was not there in the late '90s." Mr. O'Connor further acknowledged there was a period of time when there was a peaceful coexistence with Defendants. In fact, Mr. O'Connor sent a letter to Jeffrey Gossen, a registered agent for Hidden Grove, LLC, in May 2010 which stated: "[Y]ou have my permission to landscape the sections of my property to either side of your entrance gate at your expense. I will notify you in writing if our landscaping needs change and this arrangement will no longer be in our best interest." On October 2, 2017, in light of the construction done without his knowledge, Mr. O'Connor sent electronic mail to Steve Gremillion withdrawing the permission to landscape and requesting a new written agreement. Mr. O'Connor explained he sent two attachments with his email, "giving the Grove possibilities for continuing

---

[4] The letter, introduced into evidence as Plaintiffs' Exhibit Number Four, specifically references "the ongoing construction of 1) a bulkhead along the Vermillion [sic] River and 2) concrete abutments under the private bridge crossing the Rena Drive Coulee at Hidden Grove Place, directly atop existing LCG maintained trapezoidal concrete walls."

6

to work on the gate, landscaping and everything else within certain parameters[.]" However, because "[n]either of those documents were ever sent back[,]" the decision was made "to not allow contractors on our property, unless we were specifically hiring them." Mr. O'Connor conceded Defendants twice presented proof of liability insurance—once for a company owned by Mark Chaisson, a homeowner Defendant—however, he was never provided proof of workers' compensation insurance.

Mr. O'Connor testified he has been subjected to harassment and intimidation. While in his yard with his six-year old daughter on February 14, 2019, a man who identified himself as a resident of The Grove, drove out The Grove's gate, parked, and yelled profanities at Mr. O'Connor.[5]  Mr. O'Connor recalled a woman, whom he believed lives in Lot 14 of The Grove, "landscaping outside of the gated area on [his] property."  He confronted the woman, asking if he could help her.  The woman fled and called the police on Mr. O'Connor.

After Mr. O'Connor removed trees from his property, residents of The Grove called the police, falsely accusing him of trying to cut down the gas lantern at The Grove's gate.[6]  On another occasion, while work was being performed on a bulkhead in The Grove, a construction worker was cutting beams on Mr. O'Connor's property. He told the worker that he did not have permission to be on Mr. O'Connor's property.  The worker "had an expletive-laced tirade [and Mr. O'Connor] was surrounded by five individuals threatening to beat [him] up."

---

[5] Photographs of a truck parked in front of Plaintiffs' gate were introduced into evidence as Plaintiffs' Exhibit Number Thirteen.

[6] Surveillance photographs introduced into evidence as Plaintiffs' Exhibit Number 11 indicate this occurred on February 19, 2019.  Photographs, though undated, which show Mr. O'Connor cutting a tree with a chainsaw, were also introduced into evidence as Defendants' Exhibit Number Three.

Mr. O'Connor presented surveillance photographs from March 2, 2019, showing a man and the woman who called the police on Mr. O'Connor after he found her landscaping on his property. The individuals walked around his property for five minutes, repeatedly "staring in the camera[.]" Mr. O'Connor clarified that each of the incidents he had described involved individuals trespassing on his private property, not property which is subject to the right of way.

Mr. O'Connor denied ever interfering with anyone entering or leaving The Grove, saying the electronic gates cause the only obstruction. The electronic gate at the entrance of The Grove is on the right of way and, according to Mr. O'Connor, it is often out of order. Mr. O'Connor testified that even though he has never blocked The Grove's entrance gate, his private driveway has been blocked by a truck belonging to a landscaping company being utilized by residents of The Grove.[7] He also stated that the gas lantern at The Grove's entrance is not the only light source. Mr. O'Connor submitted photographs of an illuminated security light near The Grove's entrance gate. It was his observation the gas lantern is solely esthetic, not utilitarian. Mr. O'Connor recalled his conversation with Ms. Hail as "quite pleasant." He also testified his family was living with his parents. According to Mr. O'Connor, the incidents stemming from this lawsuit have caused his wife, Blair, to suffer an emotional breakdown and her therapist recommended that the family relocate.

On cross examination, Mr. O'Connor was quizzed about his knowledge of engineering and concrete. Although he admitted he has not worked with concrete, Mr. O'Connor explained he owns and manages apartment complexes and claimed he is familiar with the "need to anchor something into the concrete." Mr. O'Connor

---

[7] Surveillance photographs of this incident were introduced into evidence as Plaintiffs' Exhibit Number Seven.

has a bachelor's degree in engineering science, but he is not a licensed engineer. Mr. O'Connor conceded he has not hired an engineer, an architect, or a licensed contractor to assess the structural integrity of the construction work on the bridge crossing the coulee. His concerns are based on personal observations and the concerns expressed in LCG's cease and desist letter.

Mr. O'Connor was questioned about the following statement from his email to Steve Gremillion on October 2, 2017: "By law, the rights of use The Grove holds over property I own are restricted to a private access easement unless we enter into a separate agreement." His understanding of the access easement came from his reading of the right-of-way agreement dated 1976, but he is not an attorney and he was not told by an attorney it was a true statement. Mr. O'Connor estimated that on ten different occasions he spoke with contractors who were on his property while purportedly performing work for residents of The Grove. On those occasions, he simply identified himself as the property owner—he did not present proof of his ownership nor was he asked for proof. Mr. O'Connor admitted he notified LCG that construction work was being performed on the bridge crossing the coulee. He contacted Mark Lavergne, an engineer employed by LCG, to report that unauthorized people were constructing things on the coulee on his property.

Mr. O'Connor's property was purchased from his parents in 2010. He testified there was no written agreement concerning landscaping between his parents and The Grove's residents; however, soon after his acquisition of the property, Mr. O'Connor granted permission for landscaping at the entrance gate of The Grove, as shown in his letter to Jeffrey Gossen in May 2010. The first time Mr. O'Connor said anything to the residents of The Grove about the entrance gate was in October or November 2017. He denied ever saying anything about the gas lantern.

Mr. O'Connor installed eleven surveillance cameras in January 2019 to monitor his property. At this point during cross examination, the trial court asked, "Mr. O'Connor, when you talk about 'your property,' monitoring your property, essentially you're talking about monitoring the right of way?" When Mr. O'Connor answered in the affirmative, the trial court posed more questions:

> THE COURT: So basically, anybody traversing that right of way, it is your feeling that you have a right to query them about whether or not they have insurance . . . to do the work that a resident would require? Or do you think you have the right to stop everybody that's driving down the street and say, hey, do you have auto insurance?
>
> MR. O'CONNOR: No, sir, I do not feel that way.
>
> . . . .
>
> MR. BROUSSARD: Tell the Judge, what do you feel you have the right to do, vis-a-vis professionals doing work for the residents of the Grove, in that right of way?
>
> MR. O'CONNOR: If they're professionals performing work on my property, my land, even on the right of way, I feel that I should at least be aware of what they are doing, that they're doing it within codes, that they have the right permits and that they are insured, especially given that we have had contractors who were not licensed contractors, not insured and doing it without permits.

When asked whether he knew of Stinson gate repair company, Mr. O'Connor acknowledged he had used the gate repair service prior to this dispute, noting he verified Stinson was, in fact, licensed and insured. He was then asked, "So you have known all of this time that the company repairing that gate has the proper credentials, haven't you?" To which Mr. O'Connor replied, "No, sir, because, again, whenever I utilized him he had insurance. But that had long since expired." Mr. O'Connor testified he contacted Stinson after this dispute arose, asking for current insurance information. Although he was assured the information would be provided, Mr. O'Connor never received the credentials he requested.

10

On redirect examination, Mr. O'Connor explained his awareness there were engineering deficiencies in the structure erected on the bridge over the coulee came from his copy of a certified letter sent to Steve Gremillion from Mark Lavergne with the Public Works Department of LCG.[8]  He read aloud the following excerpt:

> Therefore, LCG is requiring that the installed abutments be removed by the individuals and/or parties responsible for constructing the structures.  A qualified engineer licensed within the State of Louisiana must develop a plan to remove the abutments and submit to LCG for review and approval prior to the commencing with the required removal.  Additionally, the engineer will be required to evaluate the trapezoidal channel for potential and/or detectable damages associated with the abatement installation.  Any damages to the trapezoidal concrete-lined channel must be repaired by the applicable individuals or parties to the satisfaction of LCG.

Mr. O'Connor recapitulated that he lived on the property the majority of his life. Although he purchased the property in 2010, he began living on the property with his parents when he was one year old.

Plaintiff Blair O'Connor also testified she has been subjected to harassment and intimidation.  She claimed homeowner Defendants have threatened "they were going to bury us in legal fees" and she felt "constantly approached by these people[.]"  In the summer of 2018, her sons were outside when a black truck with tinted windows backed into her driveway.  Mrs. O'Connor went outside and approached the truck; however, when she walked forward the truck drove forward, and when she stopped walking the truck also stopped.  Ultimately, the truck drove forward and parked on the street, across from the home's driveway.  After the truck remained a short while, Mrs. O'Connor approached the truck again.  The driver's window opened, revealing Mark Chaisson, a homeowner Defendant.

---

[8] The letter, dated August 27, 2018, was introduced into evidence as Plaintiffs' Exhibit Number Fifteen.

11

Mrs. O'Connor clarified this incident began on her private property—her home's driveway—not her property which is subject to the right of way.

When asked if other instances occurred when she felt harassed or intimidated, Mrs. O'Connor referred to February 19, 2019, the day Mr. O'Connor cut down trees on the right of way near the entrance to The Grove. She recalled several of The Grove's residents were on the right of way while an electrician made repairs to The Grove's electronic entrance gate. According to Mrs. O'Connor, the homeowner Defendants who were present "said that they were going to do what they thought they had the right to do." Consequently, the O'Connors decided to landscape.

Mrs. O'Connor testified that since Defendants obtained a temporary restraining order against them, she is "scared that if I pull any weeds that they would call the cops on us[.]" In April 2019, while she was planting flowers in her yard, Mrs. O'Connor was watched for thirty minutes by someone in a black truck parked on the right of way. Mrs. O'Connor testified she often feels anxious and helpless. As a result, Mrs. O'Connor is living with her family at Mr. O'Connor's parents' home so she can "feel safe for a while[.]"

On cross examination, Mrs. O'Connor said she assumed, but could not confirm, that Mark Chaisson was driving the black truck in April 2019. When asked the reason for cutting down trees in the right of way, Mrs. O'Connor explained it was in their plans to have a better visual of their property at the river's front. She stated the trees were planted when Defendants had written permission to landscape, permission which had since been revoked. Finally, Mrs. O'Connor testified she did not know whether the harassment she endured was authorized or approved by Hidden Grove, LLC, or the HOA.

On redirect examination, Mrs. O'Connor clarified that the road through the right of way, i.e., Hidden Grove Place, is a private road. She further stated it is her

understanding the right of way agreement does not provide for landscaping or lighting.

Following this testimony, Plaintiffs motioned for an involuntary dismissal of Defendants' requests for injunctive relief, contending Defendants failed to prove any irreparable harm. Plaintiffs asserted Ms. Hail's "only testimony of harassment was two attorneys talking to each other. She cited -- and the only instance of any complaints she had was related to landscaping, which was outside of the right of way agreement. There's no -- she was never denied any ingress or egress." Conversely, Plaintiffs contended their evidence proved various instances of harassment and intimidation by Defendants. The following dialogue succeeded Plaintiffs' motion:

> THE COURT: I'm going to deny it. Denied. Ms. O'Connor, I'm going to show you these photographs, these photographs and ask you: Do you recognize these photographs?[9]
>
> MRS. O'CONNOR: Yes, sir.
>
> THE COURT: Well, what do those photographs depict?
>
> MRS. O'CONNOR: That's me watching what trees are going to go while Kevin's cutting.
>
> THE COURT: He's cutting, essentially what looks to be a crepe myrtle?
>
> MRS. O'CONNOR: Yes, sir.
>
> THE COURT: All right. Now, what authority did he have to cut those crepe myrtles?
>
> MRS. O'CONNOR: Because we had a landscaping agreement that we reneged on; that we told them we no longer -- we had the ability to take away, and so we were changing the landscaping. We cut them down and we were replanting.
>
> THE COURT: The landscaping agreement with whom?
>
> MRS. O'CONNOR: Gossen.

---

[9] It appears the trial court referred to photographs introduced into evidence as Defendants' Exhibit Number Three.

THE COURT: What does Gossen have to do with this?

MRS. O'CONNOR: Gossen was with the Association. The Association is my -- understanding is the one who's responsible for maintaining the access.

THE COURT: Okay. Anything else?

MR. BROUSSARD: We rest, Your Honor.

(WITNESS EXCUSED)

THE COURT: All right. The Court has before it competing preliminary -- applications for preliminary injunctions. The Court has listened attentively to both sides today. The Court was not impressed with the testimony of the Plaintiff, so as to constitute sufficient evidence to grant the preliminary injunction. However, the Court was impressed with the testimony of the Association member, and, as such, I'm going to grant the preliminary injunction to the Association, and deny it for the Plaintiff.

MR. BROUSSARD: Your Honor, I would only add that, as I recall, what we did procedurally, here this morning, Your Honor, before the testimony was inclined to grant the preliminary injunction, and even the permanent injunction. And I had been under the impression that Your Honor heard the testimony to allow Your Honor to grant a permanent injunction and that's why we put on that testimony.

THE COURT: Well, we continued it the last time for preliminary injunction. Mr. Hightower, it was reset for --

MR. HIGHTOWER: Preliminary injunction.

THE COURT: And permanent.

MR. MOUTON: No, Your Honor, not permanent. Your Honor, the Court can't grant a permanent injunction without a trial on the merits and we haven't conducted any significant discovery. And this certainly wasn't noticed as a trial on the merits; it's on the rule docket. We need to have an ordinary proceeding. And I've got case law to . . . substantiate my argument.

THE COURT: Let's see, it was set for permanent injunction as well. Both[.]

MR. MOUTON: Your Honor, that's an ordinary proceeding. This is a summary proceeding. We're entitled to a trial on the merits after discovery and --

14

THE COURT:  Well, we've heard witnesses from both sides.

MR. MOUTON:  I understand, but --

MR. BROUSSARD:  This is an ordinary proceeding, Your Honor --

THE COURT:  One at a time.

MR. HIGHTOWER:  This is not what you would hear in an ordinary proceeding, Your Honor.  There's witnesses for the City that we would call, otherwise.  This is a summary proceeding.  I'm sorry, Mr. Mouton.

MR. MOUTON:  It is a summary proceeding, and I've got a list of cases here that basically say that the right to a permanent injunction may only issue after a trial on the merits, which the burden of proof is a preponderance of the evidence, where here you just have to make a prima facie case for a preliminary injunction.

MR. BROUSSARD:  Your Honor, it was an application for injunctive relief filed within an ordinary proceeding, Your Honor.  Your Honor entered a preliminary injunction at the last hearing.[10] These pictures have come about because there has been an exchange of information in discovery, Your Honor.

MR. MOUTON:  Your Honor, we have discovery outstanding.

MR. BROUSSARD:  Your Honor has heard testimony --

MR. MOUTON:  We've got discovery outstanding.

MR. HIGHTOWER:  It's nowhere near ready for an ordinary proceeding, Your Honor.

THE COURT:  Yes, but, Mr. Mouton, last week you all filed for a preliminary and the Court allowed it as of last Thursday.

MR. MOUTON:  For a preliminary injunction, not a permanent injunction.

THE COURT:  Well, which is again in violation of our local rules, because this should have been at least 10 days for a hearing on it.

MR. HIGHTOWER:  Only two, Your Honor.

_____

[10] The record does not reflect the issuance of a preliminary injunction following the hearing on March 18, 2019.  The court's minutes reflect:  "The Court ordered that the current temporary restraining order currently in place, shall remain in effect until April 8, 2019, at which time the Court reset these matters to."

MR. MOUTON:  No.  You have to have two to ten.[11]

MR. HIGHTOWER:  Two to ten.

THE COURT:  All right.  Well, you've got my ruling now, so I'm going to grant the permanent injunction.  And if I'm wrong, take it up.

MR. MOUTON:  We will, Your Honor.

MS. CLARK:  Your Honor, I just have one brief clarification.  You stated that the association's injunction is granted.  Is that also the homeowners in the individual capacity as well?

THE COURT:  That's correct.

A judgment in favor of Defendants was signed on April 24, 2019:

> restraining, enjoining, and prohibiting [Plaintiffs] from obstructing, interfering, harassing, verbally abusing, or threatening any person coming onto the right-of-way for the purpose of repairing the gate, located on or about Cambridge Drive, in Lafayette, Louisiana, in any manner whatsoever; prohibiting [Plaintiffs] from interfering with [Defendants'] attempts to repair the gas lantern that is also located on the right of way; and prohibiting [Plaintiffs] from destroying any of [Defendants'] improvements located on the servitude property, including but not limited to the sign and landscaping at the entrance of Hidden Grove Subdivision[.]

Plaintiffs now appeal, contending the trial court erred in granting injunctive relief to Defendants and in denying injunctive relief to Plaintiffs.

## ASSIGNMENTS OF ERROR

1. The trial court was clearly wrong and committed manifest error in granting a permanent injunction within the context of a summary proceeding, contrary to the dictates of *Arco Oil & Gas v. DeShazer*, [98-1487 (La. 1/20/99), 728 So.2d 841].  Indeed, at the outset, the trial court evidenced its desire to grant a permanent injunction without even a formal hearing.

2. Alternatively, the trial court was clearly wrong and committed manifest error in granting injunctive relief ab initio to Appellees despite a lack of factual and legal basis to do so.

3. The trial court was clearly wrong and committed manifest error in failing to grant preliminary injunction in favor of [the O'Connors]

---

[11] Louisiana Code of Civil Procedure Article 3602 provides, "A preliminary injunction shall not issue unless notice is given to the adverse party and an opportunity had for a hearing.  An application for a preliminary injunction shall be assigned for hearing not less than two nor more than ten days after service of the notice."

after [the O'Connors] incontrovertibly demonstrated trespass on their property free and clear of the right of way at issue, as well as within the right of way after permission was revoked to perform landscaping, maintenance on a gate, gas lighting and other activities outside of the scope of the right of way.

**DISCUSSION**

*Plaintiffs' Motion to Strike*

As a preliminary matter, we must address Plaintiffs' motion to strike statements made in Defendants' appellate briefs. Action on this motion was referred to the merits of this appeal.

Plaintiffs allege the homeowner Defendants' appellate brief contains "references to an attempt to repair an electronic gate and how it became inoperable" and relies "upon statements [David Stinson] either made or was privy to." Plaintiffs assert the record contains no evidence to support the homeowner Defendants' improper references because David Stinson did not testify at the hearing. They urge this court to strike the second and third paragraphs contained in the "Statement of the Case" of the homeowner Defendants' appellate brief.

Plaintiffs further allege the appellate brief of Hidden Grove, LLC, and the HOA references an affidavit of John Burke that was not introduced into evidence at the hearing. Plaintiffs urge this court to strike the appellate brief of Hidden Grove, LLC, and the HOA in its entirety "[a]s the improper and impermissible references form the basis for the remainder of their argument."

Plaintiffs argue that pursuant to La.Code Civ.P. arts. 2164, 2127,[12] and 2128,[13] this court is precluded from considering these statements which are not part of the trial court record. We agree.

---

[12] Louisiana Code of Civil Procedure Article 2127 provides, in pertinent part, "The clerk of the trial court shall have the duty of preparing the record on appeal."

[13] Louisiana Code of Civil Procedure Article 2128 provides:

Under La.Code Civ.P. art. 2164, "The appellate court shall render any judgment which is just, legal, and proper upon the record on appeal." "Appellate courts are courts of record and may not review evidence that is not in the appellate record, or receive new evidence." *Fruge Aquafarms, Inc. v. Hicks*, 16-1001, p. 7 (La.App. 3 Cir. 5/3/17), 218 So.3d 1106, 1111. "Evidence not properly and officially offered and introduced into evidence cannot be considered, even if it is physically placed in the record." *Id*. at 1112. Furthermore, "[t]he appellate briefs of the parties are not part of the record on appeal, and this court has no authority to consider on appeal facts referred to in appellate briefs, or in exhibits attached thereto, if those facts are not in the record on appeal." *Chavers v. Bright Truck Leasing*, 06-1011, p. 3 (La.App. 3 Cir. 12/6/06), 945 So.2d 838, 841, *writ denied*, 07-304 (La. 4/5/07), 954 So.2d 141.

At the hearing of the instant matter, the record revealed David Stinson did not testify, nor was the affidavit of John Burke officially offered and introduced into evidence. References to statements from either individual are therefore not properly before this court for consideration. Consequently, this court grants Plaintiffs' motion to strike with respect to Defendants' aforementioned references to David Stinson and John Burke—we do not rely on assertions concerning either individual in our ruling.

---

The form and content of the record on appeal shall be in accordance with the rules of the appellate court, except as provided in the constitution and as provided in Article 2128.1. However, within three days, exclusive of holidays, after taking the appeal the appellant may designate in a writing filed with the trial court such portions of the record which he desires to constitute the record on appeal. Within five days, exclusive of holidays, after service of a copy of this designation on the other party, that party may also designate in a writing filed with the trial court such other portions of the record as he considers necessary. In such cases the clerk shall prepare the record on appeal as so directed, but a party or the trial court may cause to be filed thereafter any omitted portion of the record as a supplemental record. When no designation is made, the record shall be a transcript of all the proceedings as well as all documents filed in the trial court.

*Issuance of Permanent Injunction*

Louisiana Code of Civil Procedure Article 3601(A) provides, in pertinent part, "An injunction shall be issued in cases where irreparable injury, loss, or damage may otherwise result to the applicant, or in other cases specifically provided by law . . . ." "During the pendency of an action for an injunction the court may issue a temporary restraining order, a preliminary injunction, or both . . . ." La.Code Civ.P. art. 3601(C). "The primary purpose of injunctive relief is to prevent the occurrence of future acts that may result in irreparable injury, loss or damage to the applicant. La.Code Civ.P. art. 3601." *Arco*, 728 So.2d at 843.

Plaintiffs argue the trial court erred in granting a permanent injunction within the context of a summary proceeding. They allege the trial court evidenced its desire to grant a permanent injunction at the outset, without even a formal hearing. We find merit in Plaintiffs' contention and, further, the record fully supports their allegation.

A permanent injunction can only be granted, or denied, "after a trial on the merits in which the burden of proof is a preponderance of the evidence . . . ." *Mary Moe, L.L.C. v. Louisiana Bd. of Ethics*, 03-2220, p. 9 (La. 4/14/04), 875 So.2d 22, 29. The jurisprudence clearly states that in the absence of a stipulation between the parties, a trial court cannot convert a preliminary hearing to a permanent injunction hearing. *Elysian Fields Church of Christ v. Dillon*, 08-989 (La.App. 4 Cir. 3/18/09), 7 So.3d 1227. *See also Nola Bourbon, LLC v. Rodriguez-Franco*, 17-1002 (La.App. 4 Cir. 4/18/18), 243 So.3d 693, *writ denied*, 18-817 (La. 8/3/18), 248 So.3d 1288.

Significantly, after hearing only arguments of counsel on April 8, 2019, the trial court tried to grant a permanent injunction. Counsel for Plaintiffs and two different defense counsel reminded the trial court that it was deciding whether or not

19

to issue a preliminary injunction. A third defense counsel suggested the trial court hear testimony in order to justify its issuance of a permanent injunction. Counsel for Plaintiffs vehemently objected, to no avail. As set forth in detail above, the parties presented evidence after which the trial court initially stated it would deny Plaintiffs' application for a preliminary injunction but grant Defendants'. The trial court was reminded by a defense counsel that prior to hearing testimony, it had indicated its intention was to issue a permanent injunction. Counsel for Plaintiffs again objected, arguing the trial court was without authority to issue a permanent injunction. Nevertheless, the trial court granted a permanent injunction in favor of Defendants.

This matter was scheduled for consideration of opposing petitions for preliminary injunctions. While the trial court allowed testimony, that does not negate the intimation that it was predisposed to ruling in favor of Defendants prior to the parties' submission of evidence. Furthermore, changing the objective during the hearing is in direct contravention to Plaintiffs' notice rights. Prior to the hearing, Plaintiffs were not notified of, nor did they agree at the hearing to consolidate the trial on the merits of a permanent injunction and the rule of the preliminary injunction. Consequently, we find the issuance of a permanent injunction was legal error and, therefore, we reverse the judgment of the trial court. Given this finding, this matter is subject to our *de novo* review of the trial court's denials of the parties' opposing applications for preliminary injunctions.

*Preliminary Injunction*

A party seeking the issuance of a preliminary injunction must show irreparable injury, loss, or damage will occur if the injunction is not issued and must show entitlement by a *prima facie* showing that the party has a good chance to prevail on the merits of the case. *Mount Zion Missionary Baptist Church v. Jones*,

11-961 (La.App. 3 Cir. 2/1/12), 84 So.3d 674. A showing of irreparable injury is not required "when the conduct sought to be restrained is unconstitutional or unlawful, *i.e.*, when the conduct sought to be enjoined constitutes a direct violation of a prohibitory law and/or a violation of a constitutional right." *Jurisich v. Jenkins*, 99-076, p. 4 (La. 10/19/99), 749 So.2d 597, 599. As this court explained in *El Paso Field Serv., Inc. v. Minvielle*, 03-1293, p. 9 (La.App. 3 Cir. 3/3/04), 867 So.2d 120, 127 (footnotes omitted):

> [Louisiana Code of Civil Procedure Article] 3663 authorizes the trial court to grant an injunction to protect a ROW if another obstructs or disturbs the ROW owner's possession or enjoyment of this real right in immovable property and if the ROW owner or their ancestors in title have had this ROW for more than a year. When a party seeks an injunction on this ground, there is no need to make a showing of irreparable harm. In addition, nothing in Article 3663 suggests the existence of a mandate requiring these parties to prove that the law does not offer them any other adequate remedy.

"Although the hearing on the preliminary injunction may touch upon, or even tentatively decide, the substantive issues that comprise the petition for the permanent injunction, those substantive issues raised in the principal demand will be decided only after a full trial under ordinary process." *Mount Zion*, 84 So.3d at 678.

This litigation emanates from a dispute over the scope of a right of way. Defendants' requests for injunctive relief are based on allegations Plaintiffs thwart Defendants' efforts to repair an electronic gate or beautify the entrance of The Grove, which is on the right of way. Plaintiffs deny inhibiting Defendants' rightful use of the right of way, asserting that although the electronic gate at the entrance of The Grove is often out of order, it is not the only gate. There is also a gate across the coulee, on The Grove's property, which is used by residents to exit The Grove.

Plaintiffs' request for injunctive relief is based on Defendants' alleged trespass on their private property, which is not the right of way at issue, in order to harass and intimidate Plaintiffs. They also seek to limit Defendants' use of the right

21

of way for ingress and egress until a full trial on the merits, asserting La.Code Civ.P. art. 3663 says, in relevant part:

> Injunctive relief . . . to protect or restore possession of immovable property or a real right therein, is available to:
>
> . . . .
>
> (2) A person who is disturbed in the possession which he and his ancestors in title have had for more than a year of immovable property or of a real right therein of which he claims the ownership, the possession, or the enjoyment.

Considering Defendants' evidence, we find a *prima facie* showing has not been made sufficient to justify the issuance of a preliminary injunction pursuant to La.Code Civ.P. art. 3601. Defendants have failed to present any evidence to show Plaintiffs have interfered with their use of the right of way. Ms. Hail's testimony does not support the issuance of a preliminary injunction. Ms. Hail felt harassed because Mr. O'Connor's attorney called her attorney who, in turn, called her. We decline to equate this sequence of events to harassment. Even if it were harassment, Defendants have failed to show Plaintiffs' refusals to allow maintenance of an extra gate, a gas lantern, and landscaping will cause irreparable injury, loss, or damage, and Defendants have failed to show they have a good chance to prevail on the merits of the case. Thus, Defendants' application for a preliminary injunction is denied.

Conversely, the evidence shows Plaintiffs' actions are justifiable efforts to protect their property and to defend against possible financial ramifications of Defendants' allegedly unlawful actions. For their efforts, Plaintiffs have endured threats, intimidation, and trespass on their property which is not property subject to the right of way. A finding of irreparable harm is not required to obtain injunctive relief in matters, such as this, to enjoin trespassers and other disturbers. *See* La.Code Civ.P. art. 3663(2). Thus, we find Plaintiffs are entitled to injunctive relief.

**DECREE**

For the foregoing reasons, the judgment of the trial court is reversed. Judgment is hereby rendered in favor of Plaintiffs and against Defendants. We order a preliminary injunction be issued to Plaintiffs, enjoining and restraining Defendants, their officers, agents, employees, successors or assigns, counsel, and those persons in active concert or participation with them, from harassing Plaintiffs, threatening Plaintiffs, and from using the right of way at issue herein for anything other than ingress or egress until a final judgment is rendered following a trial on the merits in this matter. *See* La.Code Civ.P. art. 3605.

Additionally, Defendants' applications for preliminary injunctions are denied. All costs of this appeal, and in the trial court, are assessed against Defendants/Appellees.

**REVERSED AND RENDERED.**